Filed 2/18/21  In re Flores CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re VICTOR MANUEL FLORES<br><br>    on Habeas Corpus. | G058938<br><br>(Super. Ct. No. 94CF2726<br><br>O P I N I O N |

Original proceedings; petition for a writ of habeas corpus.  Petition granted.

Siri Shetty, under appointment by the Court of Appeal, for Petitioner.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Randall D. Einhorn, Deputy Attorneys General, for Respondent.

\*          \*          \*

Victor Manuel Flores petitions for a writ of habeas corpus. Flores's petition claims his first degree murder conviction should be reversed under *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*) and that his two convictions for attempted first degree murder under the natural and probable consequences doctrine should be reversed under *Chiu* and *Alleyne v. United States* (2013) 570 U.S. 99 (*Alleyne*). We issued an order to show cause.

The Attorney General agrees that Flores's first-degree murder conviction should be reversed and remanded for further proceedings, but that his two attempted first degree murder convictions should be upheld under *People v. Favor* (2012) 54 Cal.4th 868 (*Favor*). We agree with Flores on both claims and remand the matter for further proceedings on his murder and attempted murder convictions.

The California Supreme Court's opinion in *Chiu* is dispositive on Flores's first-degree murder conviction under the natural and probable consequences doctrine. And in *People v. Mejia* (2019) 40 Cal.App.5th 42, review granted January 2, 2020, S258796 (*Mejia*) and *People v. Dennis* (2020) 47 Cal.App.5th 838, review granted July 29, 2020, S262184 (*Dennis*), this court has previously opined at length on the issues raised by Flores's petition on the attempted first degree murder convictions. The Supreme Court has granted review on these issues in *People v. Lopez* (2019) 38 Cal.App.5th 1087, review granted November 13, 2019, S258175 (*Lopez*). The briefs in the present matter are well done and thorough but have not presented new arguments not already considered by this court in *Mejia* and *Dennis*. Accordingly, our discussion of those issues will be mercifully brief.

FACTS

Flores and Marcos Millones were jointly tried by jury and both were "sent to prison for 26 years to life, plus two life terms, after [the] jury convicted them of conspiracy, murder and two attempted murders. These were crimes committed for the benefit of a criminal street gang while the defendants were vicariously armed." (*People v. Millones* (Sept. 30, 1998, G019380) [nonpub. opn.].) We recite the facts of the underlying crimes by quoting from our opinion in Flores's direct appeal.

"The September 25th Shooting

"On September 25, 1993, Grant Rowan was socializing with his friends, Geroge Fernandez and Ruben Cantou. Ruben was a member of the 'Compton Barrio' gang (CB), and accompanied Grant along with Robert and George as they walked through the carport of George's apartment complex. There was a group of six or seven Hispanic men in the carport, one of whom yelled something in Spanish. Someone responded with the word, 'Jeffrey,' short for Jeffrey Street, the name of another criminal gang. Suddenly, Ruben yelled, 'they have a gun!' Grant's group took off for George's apartment, near the door of which stood George, ignorant of the immediately preceding events. The Hispanic men chased Grant's group, yelling 'get 'em; get 'em!' A series of shots rang out, and one bullet hit George in the collarbone. After the spray of gunfire, the Hispanic men fled, their parting refrain being 'puro loco Jeffrey Street!' The responding police officers found numerous shell casings of both .380 and .25 caliber types, two knives, numerous bullet holes and an unspent .380 caliber round.

"The October 3rd Murder

"Teofilo and Joel Carlos were attending a party at the home of their cousin, Tony Carlos, in Anaheim. They were all members of a gang known as 'La Fabrica.' Around midnight, Tony, Teofilo and their friend, Rigoberto Garcia, went to use a clothes hanger through the window of Rigoberto's car to get his keys which were locked inside.

3

As they walked along the street, a car came swerving towards them, the occupants yelling 'big bad travelers; Jeffrey Street!' The car screeched to a halt, and Teofilo was attacked by the occupants, leaving him beaten on the street. When Joel tried to reach him to help, one of the men from the car pulled a large knife on him and began swinging it back and forth. The men jumped back into the car and drove off.

"Teofilo, Tony and Rigoberto were angry; a couple of their friends arrived soon thereafter to discuss what had just transpired. As the five men were talking outside, two cars and a white truck suddenly drove towards them and a yell could be heard, 'big bad Jeffrey Street.' The stillness was shattered by a barrage of shots coming from the vehicles. Joel received two bullet wounds: one in the stomach and one in the forehead that exited through his nose. Teofilo lay dead on the ground nearby, gunshot wounds in both legs and a fatal one to the back of his head. Numerous .380 and .25 caliber bullet casings were found in the area. The bullets retrieved from Teofilo's body were of both .380 and .25 caliber types.

"Soon after the incident, Rigoberto spoke with police officers, telling them he saw two men with guns fire on his friends. Then the people got back into the three vehicles, yelled an obscenity along with 'big bad Jeffrey Street,' and drove away. He then noted Millones' picture in a photographic lineup looked 'like one of the guys at the scene,' along with one, Marco Cisco. He also identified Juan Wezar as one of the shooters, and Javier Godinez as the other one. He failed to identify Flores.

"Police officer Charles Sullivan interviewed defendant Flores soon after the drive-by-shooting. Flores stated he was a Jeffrey Street gang member, having the moniker of 'Trigger.' At first, he denied that he knew anything about the two shooting incidents. He admitted, however, that a month before the September clash, he saw a car he recognized as connected to the CB gang. The occupants 'threw hand signs' at him and someone fired a hot, which missed. Such conduct was disrespectful to his gang, and he informed his gang partners of what had happened. The Jeffrey Street gang and the CB

4

were rivals and exchanged gunfire frequently via 'paybacks.' He added that the September shooting could have been a payback for that incident of which he was the brunt.

"Later in the conversation, Flores admitted he was involved in the September shooting. He and Millones—whose nickname was 'Shotgun'—were trying to park in front of Flores' home when people began throwing bottles at his truck. Someone advanced on him with a knife, and Millones yelled that he saw a gun. Curt statement as to their respective gang affiliations were exchanged, and Flores and Millones screeched away to gather their forces. They collected three partners and returned to the location in two vehicles, a truck and a car. They immediately noticed CB gang members, and both groups started 'throwing hand signs' and exchanging gang names: taunting behavior between gangs. One member of the Jeffrey Street group pulled out a black automatic handgun and started firing. Flores ran back to the truck as he was the getaway driver for the three of them. Flores described the incident as a gang-related shooting.

"Initially, he said he was not present at the October shooting, but that he knew it was a payback for a beating of two Jeffrey Street members by La Fabrica. Later, he talked to another officer and admitted he and Millones were at a party when fellow Jeffrey Street members arrived, telling them that they had just 'thrown blows' with La Fabrica. At that, the whole group piled into two cars and a truck and drove to the location of the clash. Immediately, he leaped from his car and started fighting with some men. Suddenly, gunshots were fired and Flores fled the area. He said his Jeffrey Street friends had guns on them but he did not discover this until their arrival at the scene of the fight. He fled with Millones and another gang member by the name of 'Peewee.'

"Police officer Conley spoke with Millones, who admitted his nickname was 'Shotgun.' He also knew that Flores' nickname was 'Trigger.' Conley found numerous items of Jeffrey Street gang material in Millones' house. Millones initially denied any involvement in the September incident. Later, he changed his story and

5

admitted he was there but fled immediately upon hearing the gunshots. The driver of the car he was in yelled 'Calle Jeffrey' as they were leaving. After returning to Jeffrey Street territory, another of his partners in crime exclaimed, 'We shot them!'

"As to the October shooting, Millones told Conley that he was not present for the shooting of the two members of La Fabrica; but then he admitted he was; then he denied the admission; then admitted again that he was there but did not see anything. Although Millones gave different accounts as to everything that transpired that night, he consistently said he was with Flores the night of the incident." (*People v. Millones*, *supra*, G019380.)

## DISCUSSION

*Flores's First Degree Murder Conviction Must be Reversed*

Flores argues that his first degree murder conviction must be reversed under the holding of our Supreme Court in *Chiu*, *supra*, 59 Cal.4th 155. The Attorney General agrees, as do we.

In *Chiu*, *supra*, 59 Cal.4th 155, our Supreme Court held "that an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles." (*Id*. at pp. 158-159.)

Here, the jury was instructed with CALJIC No. 3.02, which stated: "One who aids and abets [another] in the commission of a crime [or crimes] is not only guilty of [those crimes], but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted. [¶] In order to find the defendant guilty of the crime[s] of Murder and Attempted Murder as charged in Counts 1, 2, and 4 and the lesser related crimes, you must be satisfied beyond a reasonable doubt that: [¶] (1) The crimes of Assault with force likely to cause great

6

bodily injury (Penal Code Section 245(a)(1), or Assault (P.C. Section 240) or Battery (P.C. Section 242 [were] committed, [¶] (2) The defendant aided and abetted such crime[s], [¶] (3) A co-principal in such crime committed the crime[s] of Murder or a lesser related crime thereto, and Attempted Murder or a lesser related crime thereto, and [¶] (4) The crime[s] of Murder or a lesser related crime thereto, and Attempted Murder or a lesser related crime thereto, was a natural and probable consequence of the commission of the crime[s] of Assault with force likely to cause great bodily injury (Penal Code Section 245(a)(1)), or Assault (P.C. Section 240) or Battery (P.C. Section 242)."

The court explained that "[a] Natural and Probable consequence is defined as a consequence which is reasonably foreseeable. [¶] The aider and abettor or co-conspirator need not intend that the ultimate crime be committed, nor need he even personally foresee that it may be committed. It is enough that, objectively, it is reasonably foreseeable that the ultimate crime may occur."

The jury was also instructed "[t]o constitute a deliberate and premeditated killing, the *slayer* must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, [he] decides to and does kill." (Italics added.)

Thus, the jury was told the law permitted Flores to be convicted of first degree murder based *solely* on his intent to commit one of the target crimes of assault with force likely to cause great bodily injury, assault, or battery, and on a finding that the crime of murder was the natural and probable consequence of the target crime. Only the perpetrator, the "slayer," in the words of the instruction, needed to have deliberated and premeditated. Under this theory, the jury was *not* required to find that Flores acted with premeditation and deliberation. Under *Chiu*, this was clear error.

7

Further, the error was not harmless. The prosecutor's primary argument to the jury was that first degree murder was the objectively foreseeable result of Flores's intent to commit an assault with force likely to cause great bodily injury, assault, or battery, even though Flores did not intend to kill. As the prosecutor forcefully argued, "The prosecution has never advanced a theory that either of these two defendants . . . are the person who did the shooting. That is not the theory of prosecution in this case." "[D]id they go with the purpose of encouraging, facilitating, either by act or advice, backing up, going back with the home boys, take care of business to backup, to throw blows?" "One who aids and abets the commission of a crime, is not only guilty of that crime or those crimes, but is also guilty of any other crime committed by a principal . . . committed by whoever the shooters were, . . . which is a natural and probable consequence of the crime originally aided and abetted." "The aider and abettor or conspirator need not intend. They don't have to intend for it to happen that the ultimate crime be committed, nor they even personally foresee it. In other words, they don't even have to think it was going to happen." "With respect to the foreseeability of the ultimate crime, the issue does not turn on the defendant's subjective state of mind, what the defendant was thinking but depends upon whether under all the circumstances presented, in this particular case, and under all those circumstances, would a reasonable person in defendant's position, would have or should have known that the ultimate crime was a reasonably foreseeable consequence of the crime . . . ." These quotations are but a sample. The prosecutor continued to expound at length on the natural and probable consequence theory of liability as the foundation of guilty verdict.

In view of the instruction permitting an erroneous theory of liability, and the prosecutor's argument emphasizing that theory, it cannot be said beyond a reasonable doubt that the jury relied on a direct aiding and abetting theory in convicting Flores of first degree murder rather than the invalid natural and probable consequences theory. (*Chiu*, *supra*, 59 Cal.4th at p. 167 ["first degree murder conviction must be reversed

8

unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder"].)

Accordingly, we reverse Flores's first degree murder conviction and remand the matter to the trial court where the People will be allowed to retry the case and seek a first degree murder conviction under a direct aiding and abetting theory, or to accept a reduction of the conviction to second degree murder. (*Chiu*, *supra*, 59 Cal.4th at p. 168.)

*Under United States Supreme Court Authority, Flores's Attempted Murder Convictions Also Must be Reversed*

In California, punishment for attempted murder varies as set forth in Penal Code section 664, subdivision (a). A person guilty of attempted murder must be punished by imprisonment in the state prison for five, seven, or nine years. But if the person is guilty of attempted willful, deliberate, and premeditated murder, the punishment is imprisonment for life with the possibility for parole. (*Ibid*.) Here, Flores was convicted of two counts of attempted murder and the jury found true the allegation that the attempted murder was willful, deliberate, and premeditated.

Flores now contends that the prosecution's theory of liability for the attempted premeditated murder convictions was the same theory advanced for the premeditated murder conviction, i.e., the attempted murders were the natural and probable consequences of the crimes of assault with force likely to cause great bodily injury, assault, and battery. Indeed, both murder and attempted murder were included in the instructions on the natural and probable consequences doctrine. Flores argues that *Chiu*, *supra*, 59 Cal.4th 155, holding that the natural and probable consequences doctrine is not a valid theory of guilt for first degree premeditated murder, applies equally to attempted premeditated murder.

9

In a case decided only some 23 months before *Chiu*, the California Supreme Court held "there is no requirement that an aider and abettor reasonably foresee an attempted premeditated murder as the natural and probable consequence of the target offense. It is sufficient that attempted murder is a reasonably foreseeable consequence of the crime aided and abetted, and the attempted murder itself was committed willfully, deliberately and with premeditation." (*Favor*, *supra*, 54 Cal.4th at p. 880.) Thus, the *Favor* holding is clearly in tension with the *Chiu* rationale.

That tension was recognized by a panel of this court in *Mejia*, *supra*, 40 Cal.App.5th at page 50, review granted.[1] The *Mejia* court explained, "The critical holding in *Chiu* is that the perpetrator's mental state of premeditation and deliberation 'is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine.' [Citation.] It follows then that in the context of attempted murder, the perpetrator's mental state of premeditation and deliberation is equally too attenuated to impose liability for premeditated and deliberation on an aider and abettor under the natural and probable consequences doctrine. The unique mental state of willfulness, premeditation, and deliberation is no less subjective and personal in the context of attempted murder than it is in the context of murder." (*Mejia*, at p. 49.) Accordingly, *Mejia* held that under state law, attempted premeditated murder could not be based upon the natural and probable consequences doctrine.

Even if the holding of the *Mejia* court is incorrect, the propriety of jury instructions like those given in this case was placed in further doubt by the United States Supreme Court in *Alleyne*, *supra*, 570 U.S. 99, a case decided some 18 months after *Favor*, *supra*, 54 Cal.4th 868. *Alleyne* held that the Sixth Amendment requires any fact that, by law, increases the mandatory *minimum* penalty for a crime to be treated as an "element" of the crime, meaning it must be submitted to the jury and found true beyond a

---

[1] "[A] published opinion of a Court of Appeal in the matter has no binding or precedential effect, and may be cited for potentially persuasive value only." (Cal. Rules of Court, rule 8.1115(e)(1).)

reasonable doubt.  (*Alleyne*, *supra*, at p. 103.)  In another case involving the crime of attempted premeditated murder, a panel of this court considered the application of the *Alleyne* decision to the question whether jury instructions which mirrored those given in this case withstand scrutiny under the Sixth Amendment and concluded they did not. (*Dennis*, *supra*, 47 Cal.App.5th at p. 854, review granted.)  In *Dennis*, we held, "[u]nder the teaching of *Alleyne*, where a defendant is prosecuted for attempted premeditated murder under the natural and probable consequences doctrine, the jury must be instructed that it needs to find the attempted *premeditated* murder was a natural and probable consequence of [the target crime].  The court's failure to do so here deprived defendant of his Sixth Amendment right to a fair trial." (*Ibid*.)  We further held "this violation of defendant's federal constitutional rights was not harmless beyond a reasonable doubt" under *Chapman v. California* (1967) 386 U.S. 18, 24.  (*Dennis*, at p. 854.)

"Decisions of the United States Supreme Court are binding not only on all of the lower federal courts, but also on state courts when a federal question is involved, such as constitutionality of a stature or construction of the federal Constitution or statues."  (9 Witkin, Cal. Procedure (5th ed. 2020) Appeal, § 505; *Moon v. Martin* (1921) 185 Cal. 361, 366 ["state courts are bound by the decision of the supreme court of the United States on questions depending upon the construction of the United States constitution"].)  Accordingly, in *Dennis*, *supra*, 47 Cal.App.5th 838, we held that *Alleyne* required us to adhere to its holding, thus "freeing us from the potential stare decisis strictures of the *Favor* opinion."  (*Dennis,* at p. 851.)  We remanded "the matter to the trial court to provide the prosecution an opportunity to decide whether to retry defendant on [the special findings of willfulness, deliberation, and premeditation] with appropriate jury instructions."  (*Id*. at p. 854.)  For the reasons explained at length in *Dennis*, the same disposition is appropriate here.

We recognize our opinions in *Mejia*, *supra*, 40 Cal.App.5th 42 and *Dennis*, *supra*, 47 Cal.App.5th 838 will not be the final word on the question whether attempted premeditated murder, under the natural and probable consequences doctrine, is a valid theory of liability under *Chiu*, *supra*, 59 Cal.4th 155, and, even if it is, whether the jury instructions given here survive scrutiny under *Alleyne*, *supra*, 570 U.S. 99. Suffice to say that nothing in the Attorney General's briefing here present arguments not previously made and considered by our opinions in *Mejia* and *Dennis*. These issues will finally be resolved by the California Supreme Court in its review of *Mejia* and the lead case of *Lopez*, *supra*, 38 Cal.App.5th 1087, review granted. The Supreme Court's grant of review in *Lopez* limited review to two issues, one of which was identified by the court as follows: "In order to convict an aider and abettor of attempted willful, deliberate and premeditated murder under the natural and probable consequences doctrine, must a premeditated attempt to murder have been a natural and probable consequence of the target offense? In other words, should [*Favor*, *supra*,] 54 Cal.4th 868 be reconsidered in light of [*Alleyne*, *supra*,] 570 U.S. 99 and [*Chiu*, *supra*,] 59 Cal.4th 155?"

DISPOSITION

Flores's petition for writ of habeas corpus is granted. The judgment on his first degree murder conviction is reversed and remanded to the trial court where the People will be allowed to retry the case and seek a first degree murder conviction under a direct aiding and abetting theory, or to accept a reduction of the conviction to second degree murder. The judgment on the two attempted murder convictions is affirmed, but the special findings that the attempted murders were willful, deliberate, and premeditated are vacated. On remand the prosecution will have the opportunity to decide whether to retry Flores on the special findings under jury instructions consistent with this opinion.

12

Flores will be resentenced in accordance with the outcomes of those further proceedings.[2]
Having served its purpose, the order to show cause is discharged.


IKOLA, ACTING P. J.

WE CONCUR:


THOMPSON, J.


GOETHALS, J.

---

[2]     We note that in a companion case, we reversed the summary denial of Flores's petition for resentencing on the murder conviction under Penal Code section 1170.95 with directions to consider that petition on the merits. (*People v. Flores* (Feb. 10, 2021, G058216) [nonpub. opn.].)  This opinion has no bearing on the merits of his Penal Code section 1170.95 petition.